LURYE and another, Plaintiffs in error, vs. THE STATE, Defendant in error.

*January 10—March 31, 1936.*

For the plaintiffs in error there was a brief by *Carl H. Daley* of Superior, and a brief by *A. W. Richter* of Milwaukee, and oral argument by *Mr. Richter*.

For the defendant in error there was a brief by the *Attorney General, J. E. Messerschmidt,* assistant attorney general, and *Thomas W. Foley,* district attorney of Douglas county, and oral argument by *Mr. Foley* and *Mr. Messerschmidt*.

The following opinion was filed February 4, 1936:

Rosenberry, C. J. In July, 1933, the city of Superior being without means to pay its current and ordinary expenses, the common council of the city by resolution adopted in July, 1933, provided for the issuance of scrip in denominations of one, five, and ten dollars, and thereafter scrip was issued pursuant to that and another like resolution adopted in September, 1933. The scrip was in the form already set out in connection with the statement of facts. No proceedings were had by the common council with relation to the issuance

of the scrip or the certificates of indebtedness other than a motion from time to time to issue additional scrip pursuant to the resolutions already adopted. No tax was levied to provide for the payment thereof, nor was any question relating to the issuance of the same submitted to a vote of the people.

On November 1, 1934, scrip was outstanding in the sum of more than $195,000. In the late summer or early autumn of 1934, John Clark, Albert LaSalle, and Sam Paul conceived the idea of printing counterfeit scrip, and looked about for some one to put it into circulation. In this way Albert Lurye was brought into the matter. On the 23d day of November, 1934, the defendant, Albert Lurye, and the three persons named made a trip to St. Paul for the purpose of procuring the necessary dies and materials with which to make the counterfeit scrip. Thereafter two of these persons printed about $20,000 face value of the scrip. Of this $3,000 was given to the defendant, Albert Lurye. The printing was done in the city of Duluth, in the state of Minnesota. Shortly after the counterfeit scrip began to circulate, its true character was discovered. The persons involved in the printing endeavored to conceal evidence of their connection with it, and for that purpose threw the type and plates used by them into Lake Superior and burned the remainder of the scrip then in their hands.

The defendant, Edward Lurye, was engaged in the wholesale liquor business in the city of Superior, and on the 16th day of December, 1934, delivered to one William Frymiller $100 in certificates of indebtedness of the city of Superior consisting of six $10 certificates and eight $5 certificates. Frymiller delivered the certificates which he had received from Edward Lurye to the city clerk of Superior in partial payment upon his application for a retail liquor dealer's license. The city clerk kept the money received from Frymiller separate and apart from all other funds. The city clerk having discovered that some of the certificates deposited with

him by Frymiller were forged, investigations were made, and on December 19, 1934, the defendant, Edward Lurye, was requested to come to police headquarters. There he was informed that counterfeit scrip was in circulation, and that investigation pointed to the fact that a large portion of it seemed to have originated with him. He replied that he had been accumulating scrip for two months past and was then advised that the counterfeit scrip had only been printed about fifteen days and that LaSalle and Clark, the printers, were under arrest and had confessed. Thereupon he claimed he purchased $2,500 of the scrip from his brother Albert for $700. The police testified that he said:

"I might as well tell the truth about it. I was a darn fool to get mixed into it; that it was too bad when a man was trying to make money and be industrious and a thing like this had to happen. My only crime was that I was too ambitious."

At police headquarters the defendant, Albert Lurye, admitted that he had sold his brother, the defendant, Edward Lurye, $2,500 worth of bogus scrip for $700. The $10 certificate set out in connection with the information was identified by the clerk as a part of the money deposited by Frymiller and was identified as being spurious by the city clerk. Clark and LaSalle, who did the printing, testified upon the trial. Edward Lurye was a witness upon his own behalf, but Albert Lurye did not testify.

The defendants were informed against under the provisions of sec. 343.57, Stats., for uttering or procuring the utterance of a forged instrument. Sec. 343.56 is referred to in sec. 343.57 and is the section under which forgery is punished. The material part of sec. 343.56 is, in substance, as follows: Any person who shall falsely make, etc., any public security issued by any commissioner or other officer authorized to issue the same on behalf or for any debt of the United States or of this state or any municipal corporation, with

intent to injure or defraud, shall be guilty of the crime of forgery.

Sec. 343.57, Stats., provides that anyone who shall utter, etc., any public security mentioned in sec. 343.56 shall be punished, etc. On behalf of the defendants, it is argued that the so-called certificate of indebtedness being issued by the city of Superior without statutory authority for the issuance of such a certificate, it is void upon its face and cannot for that reason be the subject of forgery, and the defendants are therefore not guilty of uttering a forged instrument. The defendants rely principally upon two cases : *John v. State,* 23 Wis. 504, and *Norton v. State,* 129 Wis. 659, 109 N. W. 531. In *John v. State* the defendant was charged with forging an indorsement upon a draft. The court was of the view that under an act of congress an unstamped draft was void; that therefore it appeared upon the face of the instrument, which was unstamped, that it was void. The court, in disposing of the matter, said :

"The authorities cited by counsel show, that to forge an instrument which upon its face is of no validity or binding force, does not constitute the crime of forgery. And indeed no authorities would seem necessary for so plain a proposition. So soon as it appears that the alleged draft is no draft, but a mere void paper, it follows that the party was not guilty of forging an indorsement upon a draft."

In *Norton v. State, supra,* the defendant was charged with the forgery of a check, which was payable to Walsh. There was no indorsement, and it was contended, therefore, that it was valueless in the hands of the defendant and void. The court said :

"There is no question but that an instrument which is clearly void upon its face cannot be made the subject of forgery. *John v. State.* . . . . If plaintiff in error were charged with the offense of uttering this paper the considerations suggested in support of these contentions might have a bearing, but no such offense is here charged. It is immaterial that the

instrument is not available for reasons not appearing on the face of it. If it is falsely made with intent to defraud and apparently sufficient on its face it is a forgery, though other steps were required to be taken, if it were genuine, to perfect it in plaintiff in error's hands. This is upon the ground that an instrument apparently valid on its face is only voidable, if genuine, by impeaching it directly. And so here, if plaintiff in error had passed this check, which is complete and valid on its face, its invalidity would be made to appear only by extrinsic evidence impeaching its apparent validity. Under such circumstances the instrument, if falsely made with intent to defraud, is held to be a forgery because it purports to be good."

The question for determination here is, Does the instrument in question upon its face appear to be good? The defendants point out many defects in the proceedings leading up to the issuance of this certificate. No tax was levied; the certificate was not signed by the comptroller; the city had exceeded its debt limit. It did not contain on its face a statement of the purpose for which it was issued.

Sec. 62.12 (6), Stats., provides: "(6) *Funds; appropriations; debts.* (a) City funds shall be drawn out only by authority of the council and upon order of the mayor and clerk, countersigned by the comptroller, if there be one. Each order shall specify the purpose for which it is drawn, and be negotiable.

"(b) . . .

"(c) No debt shall be contracted against the city nor evidence thereof given unless authorized by a majority vote of all the members of the council."

There is no provision in the statutes which provides that an order not drawn in accordance with the provisions of sec. 62.12 shall be void or even invalid. In this connection we may call attention to sec. 62.09 (10) (f):

"(f) He [comptroller] shall countersign all contracts with the city if the necessary funds have been provided to pay the liability that may be incurred thereunder, and no contract shall be valid until so countersigned."

It is quite evident that this provision of the statute does not apply to city orders. While it is true that a city order may be designated a contract, the special provisions of sec. 62.12 govern. The certificates of indebtedness having been issued for municipal purposes and representing moneys received by the city or indebtedness of the city discharged by them, they nevertheless represented an obligation on the part of the city to return the money or money's worth so procured. We are not so certain that under the doctrine of *Thomson v. Town of Elton,* 109 Wis. 589, 85 N. W. 425, and subsequent cases, that the certificates in question were totally void under the circumstances. They certainly represented the moral obligation of the city to return what it had received. While it is probably true, as argued by the defendants, that on the authority of *Swiss v. United States Nat. Bank,* 196 Wis. 171, 218 N. W. 842, and *First Nat. Bank v. Town of York,* 212 Wis. 264, 249 N. W. 513, the certificate of indebtedness in question was so defective upon its face that one could not become a *bona fide* holder thereof, and while such orders are void in the sense that they are unenforceable and cannot be made the basis of liability on the part of the municipality issuing them, that fact can only be made to appear by extrinsic evidence, and they still have the appearance of validity and are, strictly speaking, voidable rather than void. The language used in *First Nat. Bank v. Town of York, supra,* that town orders issued without authority are absolutely void, is based upon the language of sec. 60.35, Stats., which is a penal statute and subjects the supervisor, chairman, or clerk violating any of the provisions of that section to a penalty of not less than $25 nor more than $100. There is no similar statute applying to the mayor, clerk, and comptroller of cities.

The doctrine of the rule stated in *John v. State, supra,* appears to be based upon a line of authority having its origin in *People v. Shall,* 9 Cow. (N. Y.) 778, 784. We are urged by the district attorney, in effect, to overrule that case and adopt

the more liberal doctrine based upon *People v. Krummer,* 4 Park. Cr. Rep. (N. Y.) 217, 219, which has been followed in *State v. Eades,* 68 Mo. 150, 30 Am. Rep. 780; *People v. Munroe,* 100 Cal. 664, 35 Pac. 326, 24 L. R. A. 33; *State v. Alexander,* 113 La. 747, 37 So. 711; *Gordon v. Commonwealth,* 100 Va. 825, 41 S. E. 746, 57 L. R. A. 744; *People v. Gayle,* 202 Cal. 159, 259 Pac. 750; *White v. Wagar,* 185 Ill. 195, 57 N. E. 26. It is not necessary for us in this case to overrule *John v. State, supra.* It should, however, be confined strictly to its facts. This case is ruled by *Norton v. State, supra,* for the reason that the document in question did not carry upon its face evidence of the fact that it was void. The so-called certificate of indebtedness was legally nothing more nor less than an acknowledgment of the receipt of a certain sum and a promise on the part of the city to return it, when and if the city was able. If it be true that no action could have been maintained upon it, the city was certainly under a moral obligation to carry out its part of the arrangement. The certificate of indebtedness had the appearance of validity, and could therefore be the subject of forgery.

On behalf of the defendant, Edward Lurye, it is further argued that the evidence in the record is insufficient to sustain the verdict of the jury finding him guilty of an intent to defraud. The question of intent is one for the jury, and the evidence in the record is sufficient to sustain the finding of the jury in that regard. On his behalf it is argued that he was a respected citizen of Superior, had never been in any trouble, had been active in civic affairs; that he had no knowledge of the falsity of the scrip which he bought; that when advised that the scrip was in fact false he sought to redeem it, and in that way went to the extent of redeeming $1,100 in scrip which he had not uttered. Upon the basis of these facts the jury might very well have acquitted him of the intent to defraud. On the other hand, his story does not ring true. He admitted to the police officers that he purchased $2,500

of scrip for $700; his brother also admitted the sale to Edward. Such a discount would indicate to any ordinarily prudent, careful business man that there was something wrong. The only thing that could be wrong was the fact that the scrip was not genuine. The scrip at the time was circulating freely in the city of Superior at face value or a small discount. The jury were not bound by his statements as to his intention, and upon the whole evidence the jury was warranted in finding beyond a reasonable doubt that he was guilty of an intent to defraud.

As to Albert Lurye, the evidence upon the trial was undisputed that he sold the counterfeit scrip to his brother. Such sale could have been made for no other purpose than having it put into circulation. The testimony of his accomplices establishes his connection with the whole transaction, and upon the whole evidence the verdict of the jury as to him must be sustained.

On behalf of the defendant, Edward Lurye, it is further contended that evidence admitted of what was done in the state of Minnesota by Albert Lurye and his associates was not competent evidence as against Edward Lurye. The admission of the evidence complained of does not seem to have been objected to by counsel upon that ground. While John Clark, one of Albert Lurye's associates, was testifying, the following occurred; while the witness was describing in some detail the manufacture of the scrip, the record discloses the following:

"Mr. Daley: Objected to. It is incompetent, irrelevant, and immaterial. I want my objection to stand to all this testimony so I won't be interrupting all the time." Objection overruled.

"Court: This evidence is taken subject to Mr. Daley's objection."

The evidence was certainly competent as against Albert Lurye, and the trial court correctly so ruled. Neither by ob-

jection to the admission of the evidence nor by request for instructions did counsel seek to have the effect of this testimony limited to the consideration of the guilt of Albert Lurye. In as much as there was no dispute but that Albert Lurye was associated with the manufacture of this spurious scrip, sold some of it to his brother, who was not charged with the forgery, but with uttering a forged document, it could hardly be said that prejudice appears even if the evidence had been objected to, although it might have been error to refuse a proper instruction if one had been requested.

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied, without costs, on March 31, 1936.